

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JOHN F. GRIDER,                    ]
                                   ]
    Plaintiff,                 ]
                                   ]
    vs.                        ]     CV-02-CO-2718-S
                                   ]
NORSTAN COMMUNICATIONS,            ]
INC.,                              ]
                                   ]
    Defendant.                 ]

MEMORANDUM OF OPINION

## I.    INTRODUCTION.

The plaintiff, John Francis Grider ("Grider") filed suit in state court,

claiming that the defendant, Norstan Communications, Inc., ("Norstan")

impermissibly discriminated against him based on his age in violation of

Alabama Law.  In his complaint, Grider also alleges that Norstan committed

fraud as well as breached an agreement it made concerning Grider's

employment.  Norstan removed the action based on diversity of citizenship

and subsequently filed a motion [Doc. # 17] asserting that summary

judgment is due to be granted against Grider on all of Grider's claims.  The

issues have been fully briefed by both parties and are now ripe for decision.

Upon due consideration and for the reasons set out below, the motion will

be granted.

II.     FACTS.[1]

Norstan is a telecommunications company that distributes, installs and

services private branch exchange (PBX) telephone systems to private

institutions throughout the Unites States.   After becoming unemployed,

Grider, who had prior contact with Joe Tatonetti ("Tatonetti"), a supervisor

with Norstan, called Tatonetti seeking employment with Norstan.  Tatonetti

forwarded Grider's resume to Don Schmidt ("Schmidt"), an Operations

Manager with Norstan.  Following an interview with Schmidt and Tatonetti,

Grider was hired by Norstan in March 1999, as a Branch Support Manager.

Grider's starting yearly salary was $53,000 and his status was that of

an at-will employee. (Pl.'s Dep. at 117, 123, 128-29, 131-33.)  Grider was

---

[1] The facts set out below are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

55 years of age and Tatonetti was 43 years of age when he was hired. (Pl.'s Dep. at 113; Tatonetti Decl. ¶ 3.)  At the time of his initial employment with Norstan, Grider read and signed a document that stated in part: "I understand that no promise or guarantee is binding upon the company unless made in writing and signed by an officer of the company."  (Pl.'s Dep. at 126-27.)

From March 1999 until June 2000, Schmidt was Grider's supervisor. (Pl.'s Dep. at 102, 117; Schmidt Decl. ¶¶ 13-14.)  Schmidt supervised a large area and was in charge of several other Branch Support Managers besides Grider. (Pl.'s Dep. at 119, 141; Schmidt Decl. ¶ 4.)

In October of 1999, Grider was contacted by Intermedia, Inc., ("Intermedia") which offered him a position that would pay $61,000. Grider initially accepted Intermedia's offer, but when Grider announced his intention to take the job with Intermedia, Schmidt, on behalf of Norstan, offered him more money than Intermedia in order to keep Grider from leaving Norstan. (Pl.'s Dep. at 171.) During this same conversation, Schmidt informed Grider that he was grooming him to be his replacement and told him, "You've got a great future with Norstan," and that "I have informed my

boss that I have found my replacement." (Pl.'s Dep. at 168-69.) Grider turned down the job with Intermedia and stayed with Norstan.

Grider asserts that he relied on these statements when he turned down the job with Intermedia. (Pl.'s Dep. at 171, 313.)  Grider acknowledged however that "there's no way [Schmidt could guarantee that [he] would get the job." (Pl.'s Dep. at 177.) Elaborating on that point, Grider said:

> if you're a supervisor and you are managing a person, and you know that you're going to get promoted to the next level, there is no way you can go to your boss and say, "This is who I want." Well, you can; but no, there's no guarantee, because that boss might already have somebody in line for the job.

(Pl.'s Dep. at 179.)   Schmidt never made any written promise that Grider would be his replacement nor was Schmidt an officer of Norstan at the time of any such alleged promise. (Pl.'s Dep. at 180-81; DX-4 to Pl.'s Dep.) Grider's salary was increased to $68,000, and he was paid that amount for the remainder of his employment with Norstan.

Schmidt completed Grider's only performance evaluation at Norstan on May 30, 2000, giving him a rating of "Fully Meets Expectations," the middle rating on Norstan's three-level rating system. (Ex. B to Schmidt

Decl.) In his comments, Schmidt stated that Grider "needs to continue to be in front of the customer base and talking daily with his direct reports. However, he will need to place a little more of his time to managing the financial portion of the business." (Ex. B to Schmidt Decl.)

In the first half of 2000, Norstan was reorganized. Grider's supervisor, Schmidt, was replaced by Joe Tatonetti. Unlike Schmidt, Tatonetti was only responsible for the Birmingham office and was, therefore, better able to focus on the productivity, profits and losses of that office. (Tatonetti Decl. ¶¶ 4, 6.) Before this time, Tatonetti had never exhibited any animosity toward Grider, but had said that "he was glad he had been instrumental in getting [Grider's] resume in [Schmidt's] hands." (Pl.'s Dep. at 152.)

Grider began to receive negative feedback that he contends rose to the level of "badgering, harassment, or humiliation" after Tatonetti began to supervise him. (Tatonetti Decl. ¶¶ 8, 10; Ex. A to Tatonetti Decl.; Pl.'s Dep. at 203.)  Tatonetti first spoke with Grider concerning ways he could improve his job performance on September 8, 2000. (Ex. A to Tatonetti Decl.) In this meeting, Tatonetti expressed concerns about Grider's inability to manage the performance of technicians assigned to the groups he

managed and about reports of questionable practices Grider was involved with, among other things. (*Id.*) It was noted that Grider had "overacheived" on communicating with costumers but had exhibited a failure to follow-up with some clients. (*Id.*)

After witnessing no significant improvement, Tatonetti put Grider on a performance improvement plan on October 30, 2000. (Tatonetti Decl. ¶ 11; DX-7 to Pl.'s Dep.)  Grider's performance was to be monitored for a period of three months, or until February 1, 2001, and Tatonetti was to conduct follow-up meetings to discuss his progress. (Tatonetti Decl. ¶ 13; DX-7 to Pl.'s Dep.)  If there were no improvements by February 1, 2001, Grider was to be terminated. (Pl.'s Dep. at 258.)  Both Tatonetti and Grider thought that he was showing some improvement in meeting the objectives of the plan. (Tatonetti Decl. ¶ 13; Pl.'s Dep. at 259.)  On November 27, 2000, Grider submitted his resignation.  David Jordan, then in his mid-thirties, replaced Grider as Branch Support Manager of the Birmingham Office. (Pl.'s Dep. at 280-81).

Grider testified that he resigned because he "didn't want to work in that type of managerial environment anymore." (Pl.'s Dep. at 262.)  When

questioned, Grider could not remember any specific condescending statements or treatments made by Tatonetti between the time he was put on the plan and the time of his resignation. (Pl.'s Dep. at 264, 266-67.) While Grider felt like Tatonetti did not want him there, he could not give any specific reasons why Tatonetti did not want him there. (Pl.'s Dep. at 268.)  According to Grider, in Tatonetti's condescending statements and treatment, he "never referred to [Grider's] incompetence as being age-related." (Pl.'s Dep. at 277.)  Grider did however recall Tatonetti saying once that "he could get somebody like Mike Minozi to come down here and with his knowledge and energy straighten [the Birmingham office] out, where [Grider] couldn't." (Pl.'s Dep. at 276.)  Minozi was about half of Grider's age at the time, but Grider testified that he did not know what Tatonetti meant by "knowledge and energy." (Pl.'s Dep. at 277.)

III.    STANDARD.

Summary judgment is proper "if the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ.

P. 56(c). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the nonmoving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d

1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

IV.    DISCUSSION.

    A.    AGE DISCRIMINATION.[2]

Grider alleges that he was subjected to discrimination on the basis of age. "Whether an employer intentionally discriminated against an employee . . . is a question of fact, which may be proved either through direct or circumstantial evidence." *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002) (citation omitted).

Direct evidence of discrimination is evidence that "indicate[s] that the complained-of employment decision was motivated by the decision-maker's ageism." *Damon v. Fleming Supermkts. of Fla., Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999). Thus, "only the most blatant remarks, whose intent could

_____

    [2] The complaint alleges age discrimination under Alabama's Age Discrimination in Employment Act (AADEA).   ALA. Code §§ 25-1-20 to -29  (1975), et seq. (as amended). Very few opinions, as of yet,  have been issued by Alabama appellate courts which address claims under the AADEA. Therefore, the parties, as well as this court, rely primarily on the analytical framework originally applied to federal Title VII cases, which has been extended to cover federal ADEA cases.  *See Reeves v. Sanderson Plumbing Prods, Inc.*, 530 U.S. 133, 141-142 (2000); *Cofield v. Goldkist, Inc.*, 267 F. 3d 1264, 1267 n.6 (11th Cir. 2001).   The AADEA is analogous to the ADEA and provides that "the remedies, defenses, and statutes of limitations . . . shall be the same as those authorized by the federal Age Discrimination in Employment Act." § 25-1-29.

be nothing other than to discriminate on the basis of age" constitute direct evidence of discrimination. *Early v. Champion Int'l Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990). An example of direct evidence, as explained by the Eleventh Circuit, would be "a management memorandum saying, 'Fire Earley – he is too old.'" *Early*, 907 F.2d at 1082. Nothing proffered by Grider meets this stringent standard for direct evidence. Because he has produced no direct evidence of age discrimination, Grider must prove his case through circumstantial evidence, using the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Damon v. Fleming Supermkts. of Fla., Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999) (*McDonnell Douglas* analysis applies to ADEA claims).

Under the *McDonnell Douglas* analysis, the plaintiff creates a rebuttable presumption of discrimination by proving a prima facie case of discrimination, which consists of proof that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he was subjected to an adverse employment action; and (4) a substantially younger person filled the position that he sought or from which he was discharged. *Damon*, 196 F.3d at 1359. The defendant can rebut the presumption of

discrimination by producing evidence of a legitimate, non-discriminatory reason for the challenged employment action. *Id*. at 1361. Once the presumption is rebutted, the employer is entitled to summary judgment unless the plaintiff proffers evidence from which a reasonable factfinder could conclude that the reason articulated by the defendant is mere pretext for age discrimination. *Id*. at 1361.

In other words, to establish a prima facie case, Grider must show that he is over the age of forty, that he was discharged, that he was qualified for the position from which he was discharged, and that a younger person replaced him. *Elrod v. Sears Roebuck & Co.*, 939 F.2d 1466, 1469-70 (11th Cir. 1998). Grider readily admits that he resigned from Norstan. (Pl.'s Dep. at 260.) However, he asserts that his resignation amounted to a constructive discharge, thus fulfilling the second prong of the prima facie case.

In order to establish constructive discharge, "a plaintiff 'must demonstrate that [his] working conditions were so intolerable that a reasonable person in [his] position would be compelled to resign.'" *Morgan v. Ford*, 6 F.3d 750, 755-56 (11th Cir. 1993) (quoting *Steele v. Offshore*

*Shipbuilding, Inc.*, 867 F.2d 1311, 1317 (11th Cir. 1989)).[3]

Grider only cites two specific instances which he alleges proves his constructive discharge. (Pl.'s Br. at 10-12.) The first was a conversation where he told Tatonetti, "This job is my life." Tatonetti responded harshly and said, "You're the type that has made it through your whole career, you know, by schmoozing people." When Grider became visibly upset, Tatonetti showed no sympathy saying, "Look at you. Look at you. Do you think I want somebody like you out there in front of my customers?" Grider described this response as "hateful and mean." (Pl.'s Dep. at 217-19.)   In his deposition, Grider went on to admit that Tatonetti's comments about not wanting him in front of his customers was because he was trembling.  Grider then recalled that Tatonetti said, "Look at how you're shaking.  You think I want you out there in front of my customers?"  (Pl.'s Dep. at 219.)

---

[3] *See also Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001); *Henson v. City of Dundee*, 682 F.2d 897 (11th Cir. 1982). The standard in Alabama is substantially the same.  "[T]o establish a claim of 'constructive discharge,' an employee must present substantial evidence that his or her 'employer *deliberately* [made the] employee's working conditions *so intolerable* that the employee [was] *forced* into an involuntary resignation.'" *Ex Parte Breitsprecher*, 772 So. 2d 1125, 1129 (Ala. 2000) (emphasis added)(quoting *Irons v. Service Merchandise Co.*, 611 So. 2d 294, 295 (Ala. 1992)).

The other incident involved an e-mail Tatonetti sent to all technicians and project managers.  It read: "I want to know if you ever had any bad dealings, unpleasant dealings, or anything with John Grider.  Please answer me under blind copy. This is of the strictest utmost confidence." (Pl.'s Dep. at 226.)  In addition, the record shows that Tatonetti discussed with Grider, inter alia, about reports of questionable practices that he was thought to be involved with and his inability to manage the performance of the technicians assigned to the groups he managed.  (Ex. A to Tatonetti Decl.)

The plaintiff has submitted convincing evidence that he had a demanding supervisor that made him feel bad on a couple of occasions. Yet, the court will not consider the subjective feelings of the plaintiff but rather applies an objective standard. *Doe v. DeKalb County Sch. Dist.*, 145 F.3d 1441, 1450 (11th Cir. 1998.)  The plaintiff has shown no evidence that "[his] working conditions were so intolerable that a reasonable person in [his] position would be compelled to resign.'" *Morgan*, 6 F.3d at 755-56. Viewing the evidence in the light most favorable to the nonmoving party, the plaintiff has failed to meet his initial burden of establishing a prima facie case of age discrimination because he has not established that he was

discharged. *Elrod,* 939 F.2d at 1469.

Norstan argues other grounds in support of its motion; however, those grounds will not be addressed as they are not necessary to the court's ruling.

B.    BREACH OF CONTRACT.

Grider contends that Norstan breached an agreement it made with him through his supervisor, Don Schmidt.  Grider asserts that Schmidt, and thus Norstan, promised him that he would receive a certain increase in salary and that he "had a secure ('great') future with [Norstan]" that would include replacing Schmidt if he got promoted.  (Compl.; Pl.'s Br. at 15.)  Norstan maintains that even if the alleged statements were made by Schmidt, it did not constitute an agreement that was binding on Norstan.

Since the court exercises its jurisdiction in this case based on diversity of citizenship, the court must apply the substantive law of the state in which it sits.  *Erie R. R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938).  "Alabama follows the traditional view that a contract is governed as to its nature, obligation, and validity by the law of the place where it was made, unless the parties intend the law of some other place to govern, or unless it is to

be wholly performed in some other place."  *Ex parte Owen*, 437 So. 2d 476, 481 (Ala. 1983)(citing *New York Life Ins. Co. v. Scheuer*, 73 So. 409 (1916)).

Norstan is a corporation.  A corporation acts through its agents and an "agent with actual or apparent authority may enter into a contract and bind his or her principal."  *Cook's Pest Control, Inc. v. Rebar*, 852 So. 2d 730, 738 (Ala. 2002).  Grider has not argued anything that would support a finding that Schmidt had actual authority to bind Norstan.  Therefore, the court will consider if he had apparent authority to bind his employer.  Apparent "authority is implied where the principal passively permits the agent to appear to a third party to have the authority to act on his behalf." *Treadwell Ford, Inc. v. Courtesy Auto Brokers, Inc.*, 426 So. 2d 859, 861 (Ala. Civ. App. 1983).  When Grider began his employment with Norstan, he made the following acknowledgment, "I understand that no promise or guarantee is binding upon the company unless made in writing and signed by an officer of the company." (Pl.'s Dep. at 126-27.)  Schmidt was Grider's supervisor but, as admitted by Grider, was not an officer of Norstan.

Grider did not believe Schmidt had the authority to bind Norstan to the alleged agreement as evidenced by the testimony he gave in his deposition.

(Pl.'s Dep. at 177-79.)   Without authority to bind Norstan, Schmidt's statement, even if made as alleged, could not result in a contract that is enforceable against Norstan.   As with the age discrimination claim, the other grounds Norstan argues in support of its motion will not be addressed as they are not necessary to the court's ruling.

C.   FRAUD.

Grider's fraud claim is based on Schmidt's alleged statements.   The statements did not concern then existing facts, but instead dealt with future conduct.   Where the claim of fraud pertains to future events or continued employment, the plaintiff alleges promissory fraud. *See Howard v. Wolf Broad. Corp.*, 611 So. 2d 307, 311 (Ala. 1992).   "In order to establish promissory fraud, a plaintiff must show: (1) that the defendant made a false misrepresentation; (2) of a material fact; (3) that is justifiably relied upon; (4) that the plaintiff suffered damage as a proximate result; (5) that at the time of the misrepresentation, the defendant intended not to perform the promised act; and (6) that the defendant had an intent to deceive." *Palm Harbor Homes, Inc. v. Crawford*, 689 So. 2d 3, 9 (Ala. 1997).

Grider has failed to demonstrate "that the defendant had an intent to deceive him" and "that at the time of the misrepresentation, the defendant intended not to perform the promised act."  He testified that he believed Schmidt to be a trustworthy person and he did not believe that Schmidt had ever said anything to him with the intent to deceive him. (Pl.'s Dep. at 163-64, 190.)

Grider also failed to show that he reasonably relied on Schmidt's statements.  He testified that "there's no way  [Schmidt] could guarantee that [he] would get the job." (Pl.'s Dep. at 177.) Elaborating on that point, Grider said that "if you're a supervisor and you are managing a person, and you know that you're going to get promoted to the next level, there is no way you can go to your boss and say, 'This is who I want.' Well, you can; but no, there's no guarantee, because that boss might already have somebody in line for the job. (Pl.'s Dep. at 179.)  In addition, Grider had read and signed the statement that no promise or guarantee was binding upon the company unless made in writing and signed by an officer of the company. A reasonable person in Grider's position would not be justified in relying on Schmidt's oral statements.

V.    CONCLUSION.

Summary judgment is due to be granted. A separate order will be entered.

Done, this  17  of  May, 2004.

L. SCOTT COOGLER<br>
UNITED STATES DISTRICT JUDGE